IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
07/17/2013

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 11-33205 |
| WILLIAM BRYAN CRUSBERG, | § | CHAPTER 7 |
| | § | |
| Debtor(s). | § | JUDGE ISGUR |
| | § | |
| | § | |
| CLARK ELDREDGE | § | |
| | § | |
| Plaintiff(s), | § | |
| | § | |
| vs. | § | ADVERSARY NO. 11-03505 |
| | § | |
| WILLIAM BRYAN CRUSBERG | § | |
| | § | |
| Defendant(s). | § | |

## MEMORANDUM OPINION

Clark Eldredge's § 523(a)(2)(B) objection to discharge must be denied.

### Facts

In late 2001, William Crusberg and Clark Eldredge discussed an investment opportunity.[1] Crusberg was already operating two Blimpie sandwich restaurants in Tallahassee, Florida and was interested in opening up a third restaurant.[2]

---

[1] The parties dispute who approached whom. This fact is not material to the outcome. There was also a conflict in the testimony about when these discussions occurred. Eldredge's complaint listed late 2001, but at the hearing Eldredge testified that the discussions were in 2002. (ECF No. 9 at 2, No. 40 at 9). Crusberg testified that it was late 2001 or early 2002. (ECF No. 40 at 97). The Court finds that the discussions began in late 2001.

[2] Initially the third restaurant was to be a third Blimpie franchise. However, due to issues between Crusberg and Blimpie, the third restaurant was not able to be a franchise. (ECF No. 40 at 10-11) A non-franchise restaurant was eventually opened at the third location.

1 | P a g e

Crusberg represented to Eldredge that the two existing Blimpie franchises had a positive monthly cash flow from operations. (Pl. Ex. 1). This representation was made via a three-page overview Crusberg created for Eldredge. (Pl. Ex. 1).[3]

It is undisputed that the overview played an influential role in convincing Eldredge to invest in the business opportunity. (ECF No. 40 at 17-19).

The overview listed two separate estimates of monthly cash flow: (i) a "rough figure" estimate of $6,000 per month contained on the first page of the overview; and, (ii) a separate estimate of $6,522, found by adding together entries contained in the more detailed records found on the last two pages of the overview. (Pl. Ex. 1). Crusberg compiled these figures from business records for the year 2000. (ECF No. 40 at 111).[4]

Eldredge alleged the monthly cash flow figures were overstated and materially false. Eldredge alleged Crusberg overstated the cash flow figures in order to induce him to invest in the business. (ECF No. 9 at 4) ("To induce Eldredge to invest . . . Crusberg provided written financial statements that reported the two Blimpie franchise locations were operating at a cash profit. These statements were materially false. Unknown to Eldredge, the two locations had both incurred losses for the previous years.").

Eldredge, a scientist by profession, did not have anyone else analyze the overview. (ECF No. 40 at 39). Eldredge did not request further information from Crusberg. (ECF No. 40 at 39-40).

---

[3] There were in fact a series of overviews, although the cash flow calculations did not vary. (ECF No. 40 at 12, 32).

[4] Crusberg's Exhibit 10 was only admitted for demonstrative purposes, but is reflective of Crusberg's testimony. (ECF No.40 at 111-12). It is referenced in this note for that purpose.

Two aspects of the amended complaint must be noted. First, the amended complaint describes only the $6,000 figure as the materially false overstatement of monthly cash flow. (ECF No. 9 at 2). The amended complaint does not even mention the second estimate of monthly cash flow ($6,522).[5]

Second, the complaint only alleges a misrepresentation of monthly cash flow from operations. It does not reference any other allegedly misleading statement contained in the overview. Eldredge's cause of action rests solely on the argument that the monthly cash flow figure was materially false. (ECF No. 9 at 3-4). Eldredge later argued that other aspects of the overview were materially misleading. Post-trial Eldredge argued that using cash flow figures from the year 2000 as estimates in late 2001 (when Crusberg made the representations) was materially misleading. (ECF No. 35 at 2). Similarly, at trial Eldredge argued that the materially false statement was that the amount of existing debt listed in the overview was understated. (Pl. Ex. 1 at 1; ECF No. 40 at 66-68). These issues were not tried, by consent or otherwise.

Eldredge alleged that, in reliance on these financial statements with respect to existing cash flow, he agreed to form a new company with Crusberg (Elberg, Inc.). (ECF No. 40 at 16-18). Elberg, Inc. acquired from Crusberg the existing business assets and assumed the existing liabilities of the two Blimpie franchises. The third restaurant was opened, financed primarily by Eldredge's investment. Eldredge was the majority shareholder of Elberg, Inc., with 501 shares of common stock out of a total of 1,000; Crusberg held the remaining 499 shares. (ECF No. 40 at 16).

Crusberg ran the day-to-day operations. Crusberg also served as accountant for Elberg, Inc. and oversaw all book-keeping for the company.

---

[5] As noted below, the result would not be different if the $6,522 figure were used.

The business venture was not successful. Eldredge alleged that his ultimate economic loss totaled around $500,000.00. (ECF No. 40 at 26).

In 2007, Elberg, Inc. and Eldredge filed a lawsuit against Crusberg in Florida state court. Eldredge and Elberg, Inc. received a judgment against Crusberg. The judgment was in the amount of $74,900.13 plus interest for Eldredge, and $141,385.00 plus interest for Elberg, Inc. (ECF No. 9-3 at 4).[6] Elberg, Inc. assigned its rights to the judgment to Eldredge.[7]

Eldredge seeks to have this debt excepted from discharge under § 523(a)(2)(B), arguing that the debt arose from the use of a materially false written statement (the allegedly overstated cash flow figure contained in the overview).

After denial of Crusberg's motion for summary judgment, a trial was held on September 4, 2012. Although summaries from the business ledger were admitted into evidence, neither party submitted the general business ledger into evidence. The Court noted, and the parties agreed, that submitting the general business ledger into evidence might resolve material fact issues:

> What I – let me tell you what I need to do, and I appreciate that the amount of money that is involved here meant that there couldn't be total preparation for everything, which is why I want to get the general ledger and I want to look at what occurred on depreciation and amortization.
>
> I also though want to look at it for the purpose of determining whether the 2200 was included as an expense on the profit and loss statement and included in a manner different than interest, which I've already taken out and adjusted in terms of what I've shown on here. And I want to figure out a fair way to do that where you all have the opportunity to challenge and cross-examine what people are doing, but not bring you back down if we can avoid it.

---

[6] The final judgment from the Florida state court lawsuit indicates that the judgments relate to causes of action for breach of a shareholder agreement, and for breach of an agreement to repay. (ECF No. 9-3 at 1).

[7] Crusberg disputes whether the assignment occurred. This fact is not material to the outcome.

(ECF No. 40 at 121). Whether certain booked entries (e.g., depreciation and amortization) were or were not non-cash expenditures, and whether personal expenses were incorrectly booked as business expenses, were significant and perhaps dispositive issues. Non-cash depreciation expenses or personal expenses improperly booked as business expenses should not be subtracted out of any calculation of cash flow from business operations.

The Court ordered that the general business ledger be submitted into evidence.[8] The Court invited the parties to file additional supplemental briefs limited to the issues of: (i) amortization and depreciation (including section 179 depreciation); and, (ii) where Crusberg's alleged personal expenses of $2,200 per month appear in the general business ledger. (ECF No. 40 at 121). The parties were not allowed to address other issues or submit additional items of evidence. The parties were allowed to object to the additional briefing and request cross-examination. (ECF No. 40 at 121-23).

The general ledger was admitted post-trial. (ECF No. 33). Both parties filed post-trial briefs. (ECF Nos. 36-37). Eldredge's post-trial brief and accompanying declaration primarily addressed issues other than those mentioned above.[9] Crusberg's post-trial brief, although it also in part broached unallowed issues, did touch on personal expenses, depreciation, and amortization.

Eldredge objected to Crusberg's post-trial brief and requested cross-examination. (ECF No. 38). The assertions contained in Crusberg's post-trial brief were material. As a result,

---

[8] Eldredge, not Crusberg, actually had possession of the general business ledger. (ECF No. 33).

[9] It is interesting to note, however, that Eldredge's expert's post-trial declaration notes that, when depreciation and interest payments are added back, the positive cash flow for the year 2000 is $48,537.52 (or just over $4,000 per month). (ECF No. 36 at 4).

Eldredge had the right to cross-examine Crusberg as to these assertions. The Court set a limited evidentiary hearing for July 9, 2013. (ECF No. 43).

Eldredge's cross-examination failed to undermine, if it even addressed, any of Crusberg's material assertions.

## Analysis

### I. Section § 523(a)(2)(B) Causes of Action

A key element of a § 523(a)(2)(B) cause of action is that the debt sought to be excepted from discharge must have been obtained by the use of a materially false statement. 11 U.S.C. § 523(a)(2)(B). Because the alleged false statement concerned an insider's financial condition, the false statement must have been in writing to be excepted from discharge. *Id.*

Eldredge's theory of the case is that Crusberg's representation of $6,000 in positive monthly cash flow was materially false. (ECF No. 9 at 4). Eldredge must demonstrate that the written statement was materially false in order to have the debt excepted from discharge.

Eldredge's expert acknowledged that Eldredge's initial claim (that the two existing Blimpie franchises had never at any time been cash flow positive) was simply incorrect. (ECF No. 36). Although the businesses may have had a positive cash flow from operations, the $6,000 might still be materially false—if, for example, the monthly cash flow amount (although positive) was only $500 or $1,000.

The Court finds that the representation of $6,000 (or even $6,522) of monthly cash flow from operations was not a materially false statement. The evidence shows positive monthly cash flow of at least $5,110.04. The Court finds that the difference between $5,110.04 and $6,000 (or even $6,522) is not material.

## II. Monthly Cash flow Calculation

### a. Net Income

All parties agree, and the financial records show, that the two Blimpie franchises had a net income for the year 2000 of negative $10,533.36.

Net income is not the same as cash flow. Certain expenses (e.g., interest expenses) will lower net income but not cash flow (as this expense does not affect cash flow from business operations).

### b. Depreciation

Crusberg initially argued that depreciation should not be added back in for the cash flow calculation. Crusberg's expert testified that the booked depreciation expenses appeared to be section 179 expenses (i.e., actual cash expenditures spent in a given year). (ECF No. 40 at 81-82). Were this true, these expenses would represent operational expenses from the year 2000. In other words, if in fact section 179 expenses, these amounts should not be added back to determine cash flow from operations.

Eldredge denied that these depreciation amounts were section 179 expenses. (ECF No. 40 at 112-13). The general business ledger does not clarify this issue. (Gen'l Bus. Ledger at 208).

Crusberg's expert's post-trial declaration acknowledged that he could not determine whether or not the booked depreciation expenses were in fact section 179 expenses. (ECF No. 36 at 1) ("I could not determine how depreciation was calculated from the general ledger . . . .").

The only credible evidence is Crusberg's assertion that the depreciation expenses were not section 179 expenses.[10] As a result, the depreciation expenses ($22,922.00) must be added back in to properly calculate monthly cash flow from operations.

### c. Interest Expenses (Business Related)

The parties agreed that legitimate interest expenses related to the business should be added back to determine monthly cash flow from operations. However, the parties disagreed whether all items booked as business interest expenses were in fact business interest expenses.

At trial, Mrs. Eldredge (who helped Crusberg with the business operations, and had knowledge of the books) testified that she thought Crusberg might have had her book some things as interest expenses when they were not:

> **[Mr. Cohn, Eldredge's counsel]**: Mrs. Eldredge, were there occasions in which Mr. Crusberg directed you to book something as interest that wasn't interest?
>
> **[Mrs. Eldredge]**: Now I can't say whether it was interest or not because I'm not an accountant, but he did tell me a lot of times when I would ask, Well, how do I classify this, he would say, Just put it as an interest expense.
>
> **[Mr. Cohn]**: And were some of those things other type of expenses or do you recall?
>
> **[Mrs. Eldredge]**: Yeah, I mean I believe some of them might have been the car payment. They were just different things and I don't remember specifically but they were . . . .

---

[10] Crusberg attempted to submit tax returns post-trial that showed no section 179 deductions for the years 1999-2001. (ECF No. 37-2 at 4-7). The evidentiary record was closed at the end of trial, with the exception of the to-be-filed general business ledger. Although Crusberg should have admitted these into evidence at trial, and therefore the Court could not consider this evidence, this failure did not adversely affect Crusberg. The only credible evidence (given Eldredge's expert's admission that he could not determine whether they are section 179 depreciation expenses) is Crusberg's assertion at the trial that they were not.

(ECF No. 40 at 59). Mrs. Eldredge was unable to point to any concrete example of entries which, although booked as a business interest expense, were not in fact a business interest expense.[11]

As noted above, after the hearing, the general business ledger was submitted into evidence. Of the $36,148.88 in booked interest expenses for the year 2000, Crusberg reviewed the ledger and identified only $20,099.86 as *business* interest expenses (i.e., directly related to the business and properly booked as business interest expenses, as opposed to personal interest expenses). (ECF No. 37-2 at 13). The remainder ($16,049.02) Crusberg identified as personal interest expenses. (ECF No. 37-2 at 13). Business interest expenses must be added back in order to determine monthly cash flow from operations.

Although Eldredge requested the right to cross-examine Crusberg, Eldredge failed to rebut any of these assertions.

The $16,049.02 remaining (which equals $36,148.88, the total booked interest expenses, minus $20,099.86, the actual business interest expenses) might nevertheless be added back. Even if not business interest expenses, any amounts booked but which were not operational business expenses must be added back to determine the cash flow from business operations. Whether personal expenses or interest expenses, these amounts (if not added back) will artificially deflate the amount of cash flow from business operations.

---

[11] This would only affect the cash flow calculation (in a manner positive for Eldredge) if the expenses improperly booked as business interest expenses were operational expenses (e.g., utilities, rent, food supplies). If, as Mrs. Eldredge seems to indicate, Crusberg was booking personal expenses as business interest expenses, this would still be an expense unrelated to the business operations and which must be added back in order to properly determine the monthly cash flow from business operations.

### d. Personal Expenses (Interest or Otherwise)

While discussing the business opportunity, Crusberg told Eldredge that he used $2,200 per month from business operations for personal expenses.[12] This fact is clearly stated on the overview Crusberg prepared for Eldredge. (ECF No. 29 at 3) ("I have about $2,200 in personal expenses that I would need to cover each month.").

The propriety of Crusberg's actions in a business or accounting sense is not the issue. The issue is whether personal expenses were booked as business expenses, and the effect this had on the calculation of cash flow from business operations.

In connection with the entry of the general business ledger into evidence post-trial, Crusberg identified $34,442.27 in booked personal expenses for the year 2000 (a figure that includes $16,049.02 in personal interest expenses). The Court's review of the general business ledger indicates that this figure is consistent. Eldredge's cross-examination of Crusberg failed to rebut these assertions.

The Court will not, however, give Crusberg credit for the full $34,442.27 in personal expenses for the year 2000. Crusberg told Eldredge he would need (and would be taking out of the business) about $2,200 per month for personal expenses. Allowing Crusberg to add back $34,442.27 in personal expenses incorrectly booked would render the $2,200 per month figure a false statement. The Court will only allow Crusberg to add back $26,400 for the cash flow calculation (which represents the $2,200 monthly figure multiplied by twelve months).

---

[12] Eldredge testified that the $2,200 per month was only if the restaurants were profitable. (ECF No. 40 at 20). Crusberg disputed this testimony. (ECF No. 40 at 107). Given the conflicting testimony and the fact that the written statement contains no qualification as to the $2,200 per month, the Court finds that the $2,200 was not dependent upon profitability.

### e. Amortization

Crusberg's post-trial brief lists $2,432.00 in amortization expenses for the year 2000. (ECF No. 37-2 at 1). The general business ledger entry for amortization mirrors the depreciation entry (i.e., one entry at the end of the year). (Gen'l Bus. Ledger at 203). The Court finds that, like depreciation, amortization was a non-cash expenditure. The amount must be added back in to determine cash flow from operations.

### f. Final Cash flow Calculation

The final cash flow calculation (for the entire year 2000) equals the sum of: (i) net income (negative $10,533.36); (ii) depreciation ($22,922.00); (iii) business interest expenses ($20,099.86); (iv) personal expenses (interest or otherwise) (capped at $26,400); and, (v) amortization ($2,432.00). This brings the yearly cash flow calculation to the (positive) figure of $61,320.50. This results in $5,110.04 in monthly cash flow.

### g. Statement not Materially False

The Court finds that Crusberg's statement was not materially false. As a result, Eldredge's action seeking to except this debt from discharge must be denied.

### h. Eldredge's Bona Fides

Although the Court is sympathetic to the substantial losses incurred by Eldredge, the evidence does not reflect that the losses resulted from a materially false statement. Instead, this appears to have been a failed business opportunity, with disastrous financial consequences. The Bankruptcy Code does not except these types of debts from discharge.

**Conclusion**

The Court will issue a separate Judgment in connection with this Memorandum Opinion.

SIGNED **July 17, 2013.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE